<hr/>

### COAST et al. v. McCAFFERY et al.

(Supreme Court, Appellate Division, Fourth Department. December 29, 1899.)

LEASE—REFORMATION—EVIDENCE.

     Defendant leased to plaintiff, for petroleum and gas mining, a tract of land, described in the lease by metes and bounds, as containing 50 acres, more or less. Plaintiff went over the land before executing the lease, and had the boundaries pointed out to him; and the rent was fixed at a gross sum, without reference to the number of acres. Defendant stated that there were 47½ or 52½ acres in the tract; and plaintiff, on subsequently surveying the land, discovered that it contained only 34 acres, but made no complaint on that ground for more than six months, though he met defendant daily, until after the test for oil had been made. *Held*, that the quantity of the land was not the inducement for the lease, and that plaintiff was not entitled to a reformation thereof, nor to recover a proportionate amount of the rent, because of such shortage.

Appeal from special term, Cattaraugus county.

Action by John Coast and another against John McCaffery and another. From a judgment dismissing the complaint, plaintiffs appeal. Affirmed.

This action was brought to reform a written instrument whereby the plaintiffs leased of the defendants a tract of land in the town of Carrollton, in the county of Cattaraugus, "for the purpose of operating and drilling for petroleum and gas." The term of the lease was to be for 15 years from its date, "and so long thereafter as oil or gas can be produced in paying quantities." The consideration, which was paid in cash, was $10,000; and the land leased, which comprised the farm of the defendants, was thus described in the lease: "Bounded on the north by lands of Barnard and Charles McCaffery; on the east by the lands of Chipmunk wagon road; on the south by the lands of Chipmunk creek; on the west by the lands of Barnard and Charles McCaffery,—containing fifty acres, more or less." While the description purports to contain "fifty acres, more or less," the quantity actually passed by the written instrument was only about 34 acres. The allegations in the complaint were that the defendants represented there were 50 acres in the tract, and that plaintiffs were induced to purchase in reliance upon this representation. There was no averment of fraud, or, in terms, of mutual mistake. The plaintiffs claim the land was purchased at $200 per acre, and seek a reformation of the contract to include the actual quantity leased, and for judgment against the defendants for $3,200.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

C. S. Cary, for appellants.

T. H. Dowd, for respondents.

SPRING, J. The land in controversy comprised a cultivated, cleared farm, but its value at the time of this agreement was enhanced by reason of the prospect of discovering petroleum underneath its surface. The plaintiffs purchased for speculation. If oil

was found in paying quantities, the venture would be profitable. If they failed in this hazardous experiment, their lease would be valueless, and the outlay incurred in the development a loss. The quantity of the land was not the inducing motive for the lease, but the belief it was within the "oil belt," and the probability that it contained petroleum inspired the investment by the plaintiffs. There is no claim that the defendants made any fraudulent representations in respect to the quantity of the land. The contention is that the defendants stated there were either $47\frac{1}{2}$ or $52\frac{1}{2}$ acres, and that plaintiffs relied upon that statement. Before the instrument was executed, the plaintiffs went upon the land. They were experienced in the oil business, and familiar with the locality. The boundaries of the defendants' farm were clearly defined,—on one side by a creek, on another by a highway, on the other two sides by a farm, one of which was indicated by a fence, and the remaining one by stakes. The elder Coast went around these boundaries. They were visible to any one. Plaintiffs concede they were honestly pointed out to them before the lease was made. The elder Coast testified:

"I think we went up the Chipmunk road far enough so that McCaffery showed me where the line of the South Penn lease crossed the road. I don't know but what McCaffery pointed out stakes driven at that point. That was the only line on that lease that was not plainly marked. On the other three sides it was bounded by the creek, by Barney and Charlie McCaffery's line with a fence on it, and by the highway, and he indicated where the stakes of the South · field were. * * * All of it level, so that it could be plainly seen. I guess I got under that lease all of the land included within the boundaries. * * * I think I walked over this land more than this once with McCaffery, but don't know whether I went over the land with anybody else or not. On the day following the day I went over it with McCaffery, I went down there with my son William. I think that day William, Charlie McCaffery, and I walked along by the creek. We didn't go all over it, but we went at least over a part of it. * * * William was one of my firm at that time, and is a ntiff in this lawsuit. He and I were there looking to see where the boundaries were. That is what William and I were doing there that day."

The defendants did not state the number of acres in the tract, even according to plaintiffs' version, but said there must be $47\frac{1}{2}$ or $52\frac{1}{2}$ acres, clearly indicating they did not know the precise number. The plaintiffs got the land they purchased. They understood where every boundary line was, and the land within those established lines they acquired by their lease. There is no claim of any encroachment upon this tract now. The contention is that, while the tract was unmistakable, it fails on a survey to show the requisite number of acres. Again, there was no sale by the acre, as the elder Coast stated: "McCaffery said he wanted $10,000 for that piece. I don't think he ever told me he wanted $200 an acre for the piece." The defendants deny there were any representations whatever as to the quantity of the land. It is a fair deduction, however, from the evidence, that each party supposed there were about 50 acres of land, yet there was no statement that this was the quantity. On the contrary, the evidence shows unmistakably that plaintiffs purchased the tract and bought the piece within those limits, and paid a gross sum for it. This is confirmed by

the fact that even while the negotiations were in progress the plaintiffs were having this land, with other tracts, surveyed, and within 10 days after the execution of the lease knew there were only 34 acres obtained from the defendants. They were on this land daily, the defendants resided upon it, their relations were friendly, and yet there was no intimation that there had been any mistake committed or any representations made in respect to the quantity of the land until six months later. It was not until after the test for oil had been made, and perhaps failed to meet the sanguine expectations which induced the purchase, that the objection was raised that the tract did not contain the requisite number of acres.

Courts are chary in reforming written contracts. The doctrine is thus stated in 11 Pom. Eq. Jur. (3d Ed.) § 859:

"The authorities all require that the parol evidence of the mistake and of the illegal modifications must be most clear and convincing,—in the language of some judges, 'the strongest possible,'—or else the mistake must be admitted by the opposite party. The resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error."

Also, in Christopher & T. St. R. Co. v. Twenty-Third St. Ry. Co., 149 N. Y. 51–58, 43 N. E. 539:

"The grade and degree of proof required to entitle a plaintiff to relief of this character has been many times considered by the courts of England, the federal and the various state courts of the United States, and their decisions as to the nature of the proof required show that it must be of the most substantial and convincing character."

The plaintiffs rely upon Belknap v. Sealey, 14 N. Y. 143. In that case the complaint charged that the plaintiff was led to purchase the land by the false and fraudulent representations of the defendant as to the quantity of the tract. The trial court found there were no fraudulent representations, but granted the relief sought on the ground that the parties acted under an innocent mistake, and no proper objection was raised on the trial to diverting the case to this issue. The land was in the city of Brooklyn, valuable only to be cut up into city lots, and the quantity was only half that included in the deed, and which was stated to be "about nine acres, more or less." The contract was executory, and it was apparent that the quantity was materially less than the vendee believed he was purchasing, and he would not have entered into the agreement at the stipulated price had he known the true number of acres in the tract. In Paine v. Upton, 87 N. Y. 327, the vendor represented in distinct terms that his farm contained upwards of 220 acres, and the price fixed was $150 per acre, and the court allowed an abatement from the purchase price to the extent of the deficiency at the stipulated sum per acre. In this case the title to the fee still remained in the defendants, and the plaintiffs only obtained a servient interest for the speculative purpose of boring for oil; and the probability of realizing on that hope fixed the value, not the quantity of the land. While the value was fictitious and shifting, the proof shows it did temporarily possess this augmented worth for oil purposes. The defendants made no representations and suppressed

no fact. Whatever they knew the plaintiffs knew, or at least pos-
sessed ample opportunity to ascertain. The vendees purchased
after a full inspection, and cannot now, by the aid of a court of
equity, make a new contract because, perhaps, they failed to gauge
accurately the value of this land as oil-bearing territory.

The judgment is affirmed, with costs. All concur.